IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RANDELL BERRY,                                  §
                                                §
        Plaintiff,                              §
                                                §
V.                                              §        CIVIL ACTION NO. H-08-3764
                                                §
MICHAEL J. ASTRUE                               §
COMMISSIONER OF THE SOCIAL                      §
SECURITY ADMINISTRATION,                        §
                                                §
        Defendant.                              §

## MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary

Judgment (Document No.11), and Defendant's Motion for Summary Judgment and Response to

Plaintiff's Motion for Summary Judgment.  (Document No.16).  After considering the cross motions

for summary judgment, the administrative record, and the applicable law, the Magistrate Judge

ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment

(Document No. 16) is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 11) is

GRANTED, and the decision of the Commissioner is REMANDED for further proceedings.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on December 7, 2009.  (Document No. 19).

## I. Introduction

Plaintiff, Randell Berry ("Berry"), brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") terminating his disability benefits as of June 5, 2005, and finding him no longer disabled as of this date.  According to Berry, substantial evidence does not support the ALJ's decision, and the ALJ, Thomas G. Norman, committed errors of law when he found that Berry was no longer disabled as of June 1, 2005, that Berry had the residual functional capacity ("RFC") for limited light work, which provides for him to alternate between sitting and standing at will during an 8 hour work day and  that he further must avoid heights, climbing, and moving or dangerous equipment (Tr. 17-18), and that based on his age, education, and work experience, could perform such occupations such as a gate guard, movie theater attendant, and a cleaner and polisher, and because he was no longer disabled as of June 1, 2005, his benefits should be terminated.  According to Berry, the ALJ's findings concerning medical improvement are not supported by substantial evidence.  Berry further argues that the ALJ's RFC assessment failed to incorporate any mental limitations, which he contends are supported by the record, and he argues that the ALJ's hypothetical to the Vocational Expert ("VE") was defective because it failed to incorporate all of his impairments.  Berry  seeks an order reversing the Commissioner's decision and remanding his claim for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Berry was no longer disabled as of June 2, 2005, that his mental impairment was not a severe impairment, and the ALJ's hypothetical question to the vocational expert was consistent with the medical evidence, that the decision comports with applicable law, and that it should, therefore, be affirmed.

## II. Administrative Proceedings

On December 14, 2001, Berry applied for disability insurance benefits claiming that he has been unable to work since June 13, 2000, due to back pain and the inability to stand, walk, bend, and sit for long periods of time.  (Tr. 110-112, 114).   On July 27, 2002, the Social Security Administration granted his application based on the determination that Berry's condition medically equaled Listing 1.04. (Tr. 13, 48).  Thereafter, the Agency found Berry no longer disabled as of June 1, 2005, using July 27, 2002, as the comparison point decision ("CPD").  (Tr. 76-78).  After a hearing by a state agency disability hearing officer, the termination determination was upheld on reconsideration. (Tr. 46-55).  Berry requested a hearing before an Administrative Law Judge.  The Social Security Administration granted his request and the ALJ  held a hearing on April 17, 2008.  Testifying at the hearing were Berry, a medical expert, and a vocational expert.  (Tr. 372-399).  On May 9, 2008, the ALJ, applying the eight step termination of benefits sequential evaluation process issued his decision finding Berry was no longer disabled as of June 1, 2005.  (Tr. 13-20).  At step one, the ALJ found that through June 1, 2005, Berry had not engaged in substantial gainful activity.  At step two, the ALJ found that since June 1, 2005, Berry did not have an impairment or combination of impairments that met or medically equaled a Listing.  At step three, the ALJ found that medical improvement occurred as of June 1, 2005.  At step four, the ALJ found that the medical improvement was related to the ability to work.  At steps five and six, the ALJ found that Berry had chronic lumbar sprain, a severe impairment within the meaning of the act.  The ALJ also found that Berry's depression was not a severe impairment within the meaning of the Act.  At step seven, the ALJ found that Berry had the RFC to perform a limited range of light work, but that he could no longer perform his past relevant work, as a truck driver.  In connection with this determination, the ALJ found

3

Berry's allegations concerning the intensity, persistence and limiting effects of his symptoms, not credible. At step eight, based on vocational expert testimony, Berry's age (younger individual), education (high school), and RFC, and using the Medical Vocational Rules as a framework, the ALJ found that Berry could perform work as a gate guard, a movie theater attendant, and a cleaner and polisher, all of which are jobs that are found in significant number in the national economy and that, Berry, therefore, was not disabled within the meaning of the Act and that based on the totality of the above findings, that Berry's disability ended as of June 1, 2005.

Berry sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 6-9). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Berry's contentions, in light of the applicable regulations and evidence, the Appeals Council concluded, on June 30, 2008, that there was no basis upon which to grant Berry's request for review. (Tr. 21-23). The ALJ's findings and decision thus became final. Berry has timely filed his appeal of the ALJ's decision. 42 U.S.C. § 405(g). The Commissioner has filed a Motion for Summary Judgment (Document No. 16), and a Response to Plaintiff's Motion for Summary Judgment. (Document No. 16). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 11). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 399 (Document No. 9). There is no dispute as to the facts contained therein.

4

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is, only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a

suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  *Id.*  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.  I

In cases, such as the instant action, involving a termination of benefits, the inquiry shifts to a determination of whether substantial evidence supports a finding of medical improvement in the claimant's impairment or combination of impairments, and, if so, whether this medical improvement is related to the claimant's ability to work.  20 C.F.R. § 404.1594(a); *see also* 42 U.S.C. § 423(f). Accordingly, disability benefits may be terminated if there is substantial evidence demonstrating that:

(A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and

(B) the individual is now able to engage in substantial gainful activity.

42 U.S.C. § 423(f)(1).   Medical improvement is related to a claimant's ability to work if there has been a decrease in the severity of the impairment and an increase in the claimant's functional capacity to do basic work activities.  20 C.F.R. § 404.1594(b)(3).  The Commissioner bears the burden of proof under the medical improvement standard to prove that the claimant is no longer disabled. *Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002).

Medical improvement is defined under the applicable regulations as a "decrease in the medical severity of [the] impairment(s) which was present at the time of the most recent favorable medical decision" of disability.  20 C.F.R.    § 404.1594(b)(1).  The determination of "a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the] impairment(s)."  *Id.*  A medical improvement is related to the ability to do work if the improvement creates an "increase in [the] functional capacity to do basic work activities."  *Id.* § 404.1594(b)(3).

Similar to the five step sequential evaluation process for determining disability status, the Commissioner has established an eight step sequential evaluation process for determining whether a claimant who has previously been found disabled has experienced medical improvement related to the ability to work.   At step one, the ALJ addresses whether a claimant is engaging in substantial gainful activity.  A claimant who is working is not disabled regardless of the medical findings.  At step two, the ALJ addresses whether claimant meets or equals a listing described in Appendix 1.  20 C.F.R. §404.1594(f)(1), (2).   At step three, the ALJ assesses whether there has been medical

improvement in that condition. *Id.* § 404.1594(f)(3). Next, the ALJ assesses whether any such medical improvement is related to the claimant's ability to work. § 404.1594(f)(4). Disability will be found to continue at the fifth step if there has been no medical improvement (or none related to the ability to work) and none of the exceptions to the medical improvement doctrine set forth in 404.1594(d) or (c) apply. *Id.* § 404.1594(f)(5). On the other hand, if medical improvement is shown to be related to the claimant's ability to work, at step six, the ALJ must assess whether all current impairments are severe. If they are, then, the ALJ must assess whether the claimant can perform substantial gainful activity, first by looking at past work (step seven) and then to other work (step eight). *Id.* § 404.1594(f)(6)-(8). The Commissioner bears the burden of proving that the claimant has experienced medical improvement such that the claimant can now engage in substantial gainful activity. 20 C.F.R. § 404.1594(b)(5); *Waters v. Barnhart*, 276 F.3d 716, 717 (5th Cir. 2002).

Here, at issue, is the ALJ's determination that there had been a decrease in the medical severity of Berry's impairment, and that his medical condition had significantly improved such that as of June 2005, he could engage in substantial gainful activity and was no longer disabled within the meaning of the Act.

By way of background information, Berry injured his back in a truck driving accident in June 2000. Despite the severity of Berry's injuries, there are relatively few medical records. Berry underwent an independent medical evaluation by Dr. Fred L. DeFrancesco on September 6, 2000. As part of his evaluation, Dr. DeFrancesco performed a musculoskeletal examination, which included measurement of Berry's lumbar range of motion such as lumbar flexion, lumbar extension, supine straight leg raising, right, supine straight leg raising, left, lumbar right lateral flexion, and lumbar left

lateral flexion. Dr. DeFrancesco opined that Berry had "status post thoracolumbar strain." (Tr. 233).

Dr. DeFrancesco wrote:

> According to the history provided, Mr. Berry sustained an injury while driving a truck which rolled over onto its side.  On this physical examination, one notes that there were minimal objective findings with no evidence of muscle spasms; however, there was a limitation of motion demonstrated, which was felt to be secondary to two factors– one (especially with flexion of the lumbar spine), the size of this abdomen and two, some degree of voluntary splinting.

> His physical therapy, which he is receiving five time per week, does not seem to be helping his condition and apparently only consists of heat and ultrasound–there are reportedly no exercises given to this individual.  In my opinion, this treatment appears to be inadequate, as it is not helping his condition and therefore should be discontinued.  He has not had any additional diagnostic studies, such as an MRI of the lumbar spine, which was considered by Dr. Likover.

> At this time, it is my opinion that the examinee should go into work-hardening, and for the sake of completeness undergo an MRI of the lumbar spine to rule out any problems– although there are no radicular signs, but again, this is for completeness sake.  Once he completes work-hardening, he will probably be able to return to work, unless his MRI proves otherwise or his symptoms change and necessitate him seeing a neurosurgeon or orthopaedic surgeon.

> So in summation, at this time, I do not feel the examinee should be placed at maximum medical improvement nor assessed a whole person impairment at this point in time.

> Again, I do not feel the examinee should return to work at this time, in a light-duty capacity or otherwise and should undergo a work-hardening program. (Tr. 233-234).

A MRI of Berry's lumbar spine that was taken on October 27, 2000, revealed he had "mild diffuse bulges and mild posterior herniations at the lower three levels." (Tr. 218).  Berry also underwent an MRI of the cervical spine.  The radiologist opined that Berry had "posterior herniations at C3-4, C4-5, and C5-6 with central canal stenosis.  There is at least mild bilateral foraminal narrowing at all three levels."  (Tr. 217).  Finally, Berry had an MRI of his thoracic spine on November 3, 2000.  It was

normal. (Tr. 216).  On February 28, 2001, Berry was examined by Dr. Eric Scheffey.  (Tr. 268-269).

The results of Berry's physical examination revealed:

> Physical exam reveals a 29-year-old male in moderate distress.  Examination of his neck reveals some cervicothoracic spasm.  The patient has some tenderness mostly down in the thoracic area along the scapula border.  The pain really centers down over the low back.  The patient has full motion in his neck with normal grip strength.  Examination of his low back reveals marked tightness across his lumbosacral spine and into his buttocks.  Flexion more than 10 [degrees] from the vertical causes pain.  No extension, no lateral bending.  Motor exam reveals some EHI, and dorsi flexor weakness bilaterally, plantar flexors are 4+/5+ bilaterally.  Sensory exam reveals decreased sensation over the L5-S1 dermatome pattern.  MRI's are reviewed.  The patient has evidence of some posterior disk herniations at C3-C4, C-4-C5, C5-C6 with central canal stenosis and disk herniation that is quite large at 4-5 and 3-4 with bulging disk above and below and disk herniation at 5-1.  X-rays show some narrowing of the disk space at 4-5 and 5-1.  (Tr. 269).

In light of the above findings, Dr. Scheffey opined that Berry had: (1) herniated cervical disk; (2) herniated lumbar disk; (3) lumbar radiculopathy; and (4) failed conservative treatment to date.  (Tr. 269).  The medical records further show that on April 2, 2001, Berry underwent a nerve conduction study and an EMG.  According to the notes of Dr. Athari, Berry's "needle exam showed chronic denervation potentials in the L4-L5/L5-S1 paraspinal myotomes, suggestive of radioculopathy." (Tr. 225).  Based on these findings, Dr. Athari suggested that Berry have a clinical correlation of these findings.  (Tr. 215).  Berry was re-examined by Dr. DeFrancesco on July 11, 2001.  (Tr. 219-224).  At this time, Dr. DeFranscso not only examined Berry but reviewed the three MRIs.  Based on the diagnostic studies, and objective findings, Dr. DeFrancesco opined that Berry had "lumbar strain, resolved." (Tr. 223).  With respect to this diagnosis, Dr. DeFrancesco wrote, in pertinent part:

> This gentleman was involved in a motor vehicle accident in June of 2000.  He has been receiving treatment which he states has not had any improvement.
>
> Based upon this examination, one notes some inconsistencies.  He was able to sit during the interview in a straight back chair without any difficulty.  He was able to sit

11

on the examination table with his back straight and his knees dangling at 90 degrees yet he could not flex more than 40 degrees without complaining of severe pain or extension. He was able to flex his knees while in the supine position complaining of pain in his back. Straight leg raising was found to be painful with the examinee stopping.

In my opinion, this gentleman shows signs of general overlay during the examination. The MRI of the lumbar spine [show] mild diffuse bulges and mild posterior herniations at the lower three levels.

In my opinion, no further treatment is indicated other than an at-home exercise program. A course of weight reduction would be beneficial. I do not believe at this point in time that further epidural steriod injections or trigger point injections would be of any benefit.

In *strict* accordance with the Guides to the Evaluation of Permanent Impairment, Third Edition, Second Printing, American Medical Association, the examinee is granted a (5%) whole person impairment for the mild bulges and mild posterior herniation noted on the MRI of the lumbar spine *per Table 49, Section II-B on page 73.*

*A Functional Capacity Evaluation* was performed in conjunction with this evaluation to determine his work capabilities. However, the examinee did not demonstrate the physiological changes normally observed when a person is giving a maximal effort; therefore, a work category could not be determined.

On physical examination, the examinee appeared deconditioned as it has been over a year since he has worked; therefore, I would recommend a work-conditioning program not to exceed four weeks in duration. Upon completion of his program, I see no reason why he cannot return to work without any restrictions.

In summation, the examinee has reached maximum medical improvement with a (5%) whole person impairment. He is deconditioned and should be enrolled in a work-conditioning program and return to work upon completion. Again, a weight loss program would prove to be beneficial to his overall health and back. (Tr. 223-224) (emphasis in original).

Berry underwent, in connection with his disputed workers compensation claim, a third independent medical examination by Dr. Martin Bloom on October 1, 2001. (Tr. 237-242). Dr. Bloom opined that Berry had chronic lumbar strain. (Tr. 238). With respect to this diagnosis, Dr. Bloom wrote:

Physical examination reveals the patient who states he is 5'8" tall weighing 270 pounds. He had a normal stance and gait. He could heel and toe walk normally. He could squat fully. Motor and sensory examination of the lower extremities was normal. There was no lower extremity atrophy noted. Deep tendon reflexes were 2+ symmetrical at the knees and ankles. The patient had a full range of motion of his hips.

Please refer to the accompanying lumbar range of motion worksheet for range of motion and straight leg raising results. As can be seen lumbar flexion and extension measurements were invalid. The patient was offered to have the measurements retested on the date of his examination. He elected to make a separate appointment and come back on a second visit for this testing and then did not show up for that appointment. On the day he was supposed to come he requested to reschedule, however because of time restraints imposed by the Texas Worker's Compensation Commission on receipt of this report, that was not feasible. Further, it is my opinion that further testing would be very unlikely to yield significant different results.

An MRI of the patient's lumbar spine performed at Southwest MRI and Diagnostic Center on October 27, 2000 was compatible with diffuse mild disc bulges and mild posterior herniations at the lower 3 levels. (Tr. 238).

On October 15, 2001, Berry was examined by Dr. Carl Hicks. The purpose of the examination was a spinal surgery second opinion. Dr. Hicks opined that Berry had degenerative disc disease, herniated disc and low back pain and that based on this diagnosis, Berry was not a candidate for surgery. With respect to his examination of Berry, Dr. Hicks wrote:

Physical examination today reveals sensation to be intact to light touch in his feet. The motor strength is difficult to assess due to give away weakness in all groups tested in his lower extremities. The reflexes are equal and symmetric at the knee and ankle. Straight leg raising produces pain at his lower back bilaterally. Rotation of his hips of 5 [degrees] to 10 [degrees] produces severe pain in his lower back. He is unable to perform figure-4 testing. He has severe pain in his lower back with light palpation over the back. He has significant pain in his back with hip compression. He has pain his back with flexion to approximately 25 [degrees] and extension of approximately 10 [degrees]. (Tr. 244).

The medical records further show that Berry was treated at the Cate Chiropractic Clinic in 2002. (Tr. 255-275). On January 29, 2002, Berry was referred for a functional capacity assessment

that was performed by another chiropractor, Marcus Hayes, DC. (Tr. 258-264). According to the assessment, Berry was capable of performing sedentary level or less type work. (Tr. 259). The Chiropractic Clinic also referred Berry for a clinical psychological interview by the Behavioral Healthcare Associates. The interview took place on April 30, 2002. (Tr. 281-287). As part of the evaluation process, Berry was administered several tests including the Beck Depression Inventory, Pain and Impairment Rating Scale, Spielberger State/Trait Anxiety Inventory, Coping strategies questionnaire, and the Minnesota Multiphasic Personality Inventory-2. Based on the interview and testing, the psychologist opined that Berry had an adjustment disorder with mixed anxiety and depressed mood and alcohol abuse. Berry had a GAF of 50. Overall, Dr. Karen E. Krause, Ph.D. opined that Berry was an appropriate candidate for work hardening and she suggested he participate in short-term individual psychological counseling.

In connection with his DIB application, a state disability determination doctor reviewed Berry's records on February 20, 2002, and concluded that Berry could lift twenty pounds occasionally, ten pounds frequently, and could sit, stand, and walk for six hours out of an eight hour work day. (Tr. 248). As for postural limitations, Berry could frequently climb, stoop, and crawl but only occasionally kneel, or crouch. (Tr. 249). Berry had no manipulative, visual, communicative, or environmental limitations. A Case Assessment form was completed on July 1, 2002, which shows that Berry's alleged impairment (herniated lumbar disc with radiculopathy), was medically equal to listing 1.04.[2] (Tr. 288). Specifically, the Case Assessment states:

---

[2]1.04 *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal archnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
    A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle

30[year old] male injured back 6/00. [Claimant] has been treated with many conservative type [treatments]. [Claimant] has failed conservative [treatment.] [Claimant continues to have severe pain. Surgery has been determined to not be an option. [Claimant] rates his pain as an "11" on scale of 1 to 10. [Claimant] is very limited in his daily activities due to pain. [Claimant] sees himself having no control over the pain. [Claimant] alleges significant limitation in [activity of daily living]. Short diary. (Tr. 288).

A Medical Review Worksheet completed around this time identified Berry's impairments as follows: primary (disorder of the back), secondary (obesity level III, BMI of 40), and tertiary (adjustment disorder.). (Tr. 289). Based on this Case Assessment, Berry was awarded benefits on July 27, 2002.

On March 14, 2005, Berry was referred by the state disability determination services for a consultative examination by Dr. Bernard Z. Albina with Orthopaedic Associates. (Tr. 290-292, 295-296). It is Dr. Albina's opinion that the ALJ relied on in finding Berry's condition improved to the extent that he was no longer disabled. Dr. Albina wrote:

**PHYSICAL EXAMINATION:** Physical exam showed the presence of an overweight 33 year-old Caucasian male. Height: 5 foot, 8 inches, Weight: 235 pounds. He is ambulating with the assistance of a cane. At my request he was able to walk in the examining room without the cane. The patient is noted to be able to

---

weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report or tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysethesia, resulting in the need for changes in position or posture more than once every two hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00(B)(2)(b).

20 C.F.R. Pt. 404, Subpt. P., App., 1 § 1.04.

15

stand on his tiptoes and on his heels, and had difficulty walking on his tiptoes and on his heels.

Eyes, ears, nose and throat were normal.  Neck showed no spasm or limitation of motion.  The range of motion of the neck showed rotation at 75 degrees to the right and to the left and extension at 65 degrees and flexion at 60 degrees.

Bicipital and tricipital jerks are normal in the upper extremity.  Sensory exam in normal in the upper extremity and no muscle weakness or lack of coordination is noted in the upper extremities.

The examination of the thoracolumbar spine showed tenderness in the left lumbosacral area and minimal spasm is noted.  Forward flexion of the spine is at 60 degrees, lateral bend to the left is at 25 degrees and to the right at 30 degrees.

Leg-raising is normal in the sitting position, bilaterally.  Ankle and knee jerks were normal bilaterally.  Girth measurements were taken at 9 cm below the lower pole of the patella, and measured 45 cm both on the right and the left.

**RADIOLOGIC FINDINGS** X-rays of the lumbar spine showed no evidence of bony abnormalities and no evidence of spondylolistehsis was noted.

**FINAL IMPRESSION:** Mr Berry has findings compatible with chronic lumbar sprain.  I do not anticipate that any surgery will be needed for this treatment in the next 12 months.

A second residual functional assessment was completed by a DDS physician on April 1, 2005.  (Tr. 298-305).  According to the assessment, Berry could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand and/or walk for a total of 6 hours in an 8 hour workday, could sit about 6 hours in an 8-hour workday, and could push and/or pull for an unlimited time.  As to postural limitations, the DDS physician found that Berry could never climb ladder/rope/scaffolds, but could occasionally climb-ramp/stairs, stoop, and crouch and could frequently balance, kneel and crawl.  (Tr. 300).  Lastly, the DDS physician opined that Berry had no manipulative limitations, no visual limitations, communicative limitations, and environmental limitations.  (Tr. 300-303).   Berry underwent another psychological evaluation with Dr. McClure on May 8, 2005.  (Tr. 306-310).

According to the evaluator's report, the evaluator interviewed Berry, administered a mental status examination and reviewed Berry's April 30, 2002 mental health evaluation. According to Dr. McClure, Ph.D., Berry had a good prognosis and had " recovered significantly from his earlier depression." (Tr. 309). Dr. McClure opined that Berry had a depressive NOS and nicotine dependence. Dr. McClure noted that "Mr. Berry reported symptoms of depression, but does not meet the criterial for a major depression." (Tr. 309).

On July 8, 2005, a psychiatric review technique form was completed by C. Lanktora, Ph.D. (Tr. 312-325). Dr. Lanktora did not examine Berry. The evaluation was based on a review of his records. Dr. Lanktora opined that Berry had depressive disorder, NOS. According to Dr. Lanktora, Berry would have no functional limitations with difficulties in maintaining concentration, persistence or pace and no episodes of decompensation, each of extended duration. The doctor further found that Berry would have mild limits in his restriction of activities of daily living, and difficulties in maintaining social functioning.

Another psychiatric evaluation that was performed on November 8, 2005 by Dr. Dominic M. Joseph. (Tr. 326-329). Dr. Joseph opined that Berry's prognosis was guarded and he diagnosed Berry with alcohol dependence, continuous, history of marijuana dependence, currently in remission, and major depression, moderate-to-severe, without psychotic features. Berry had a GAF of 45. Dr. Joseph found:

> The patient is a 34-year-old Caucasian male, who has long history of alcohol dependence, currently relapsed two months ago after this best friend apparently passed away and also he lost his two grand babies right after birth. The patient relapsed on alcohol two months ago and the patient is currently not on any psychotropic medication. The patient was encouraged to stop drinking alcohol and also to contact AA and also the MHMR clinic. The patient is encouraged to get back on his medication....(Tr. 329).

17

On December 2, 2005, a DDS evaluator completed an advisory psychiatric review technique form. (Tr. 330-343). The evaluator considered Berry's alleged affective disorder and substance addiction disorders. According to the assessment, Berry had a disorder (major depression) but that it did not satisfy the diagnostic criteria of Listing 12.04. Next, the evaluator considered Berry's functional limitations. According to the evaluator, Berry had moderate limitations with restrictions of activities of daily living, mild limitations with difficulties in maintaining social functioning but had no limitations in difficulties in maintaining concentration, persistence, or pace or with episodes of decompensation, each of extended duration.

An advisory physical residual functional capacity assessment was completed around this same time. (Tr. 344-351). The evaluator opined that Berry could occasionally lift and/or carry 50 pounds, could frequently lift and/or carry 25 pounds, could stand and/or walk about 6 hours in an 8 hour workday, could sit about 6 hours in an 8 hour workday, and could do unlimited push and/or pull. With respect to postural limitations, Berry could frequently climb ramp/stairs and ladder/rope/scaffolds, balance, kneel, and crawl, and could occasionally kneel and crouch. (Tr. 346). Berry had no other limitations. (Tr. 347-348). Finally, a medical source statement of ability to do work-related activities (mental) was completed in June 2008. According to the DDS psychiatrist, Berry had "slight" limitations in his ability to understand, remember, and carry out instructions in the following areas: understand and remember detailed instructions and carry out detailed instructions. Likewise, as to Berry's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting, he had "slight" limitations in his ability to respond appropriately to changes in a routine work setting and respond appropriately to work pressures in a usual work setting. (Tr. 356-357). "Slight" is defined as having "some mild limitations in this area, but the

18

individual can generally function well." (Tr. 356).   A psychiatric review technique form was completed on April 17, 2008 by Dr. Ashok I. Khushalani. (Tr. 358-371).  Dr. Khushalani found that Berry had "mild" limitations in his restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 368).

A hearing was held on April 17, 2008.  (Tr. 372-399).  Berry testified at the hearing. According to Berry, even though he had a driver's license, he seldom drove. (Tr. 376).  Berry stated that since his truck accident in 2000, he has lower back pain, and more recently left thigh pain. (Tr. 379).  Berry stated that he has difficulty maneuvering around. (Tr. 380).  Berry estimated he could stand continuously without pain for about 45 minutes to an hour. (Tr. 380).  Berry further testified he could sit for an hour to an hour and a half.  (Tr. 380-381).  Berry stated that he tries to walk approximately 100 feet, three times a day. (Tr. 381).  According to Berry, when he overextends, he sits in a recliner and takes a muscle relaxer. (Tr. 381).  Berry stated that he takes Ibuprofen and Robaxin, a muscle relaxer. (Tr. 382).  Berry's daily activities include taking a shower, walking to his mail box, watching television, and reading. (Tr. 383-384).  Berry estimated that he could lift a gallon of milk and could lift ten to fifteen pounds. (Tr. 385).  Berry also testified about his depression. (Tr. 387).  According to Berry, his depression has improved because he has "learned to live with it, more or less." (Tr. 388).  Berry testified that his depression is caused by his inability to work. (Tr. 389).  A medical expert in psychiatry testified at the hearing. (Tr. 391-395).  Dr. Khushalani testified that Berry met criteria A and B for listing 12.04 (Affective Disorder)  but did not meet criteria C. According to Dr. Khushalani, Berry had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace but had no other limitations.   He further testified that Berry had slight limitations in understanding

19

and remembering detailed instructions; carrying out detailed instructions; responding appropriately

to work pressures in a usual work setting and responding appropriately to changes in a routine work

setting. (Tr. 394-395). Finally, Robert Cox, a vocational expert, testified. (Tr. 395-396). The ALJ

posed the following hypothetical question to the Vocational Expert:

> ALJ: Okay.  So based on his age, education, and past work experience, assume I find
> he has to alternate between sitting and standing at will, lift up to 20 pounds at a time,
> no lifting over ten pounds, no heights or climbing, and no moving or dangerous
> equipment, and I don't think there's anything from the mental side from the
> recommendations.  Dr. Khushalani said they're all slight or none.  I didn't see
> anything there.  Could he do his past relevant work?
>
> VE: No, sir.
>
> ALJ: Do his skills transfer?
>
> VE: No, not to, if there's since you took away no moving or dangerous equipment,
> he wouldn't be able to do any driving.
>
> ALJ: Okay.
>
> VE: And the sitting and standing wouldn't be something that a person could do with
> the driving job.
>
> ALJ: Okay.  Could you give me three examples of unskilled please?
>
> VE: Yes, sir.  There are light, unskilled jobs which would be within the parameters
> that you gave me.  That would be jobs such as a gate guard, small parts assember–
>
> *                          *
>
> And another would be cleaner and polisher....
>
> ALJ: If somebody like the claimant has to lay down for at least, or be down in a
> reclining position for at least two hours out of the ordinary workday, what would be
> your response?  Would there be any type of jobs that he could do?
>
> VE: None that I could think of, no, sir.  (Tr. 396-398).

Here, the ALJ found that medical improvement occurred as of June 1, 2005.  The ALJ wrote:

> The medical evidence supports a finding that, as of June 1, 2005, there had been a decrease in medical severity of the impairment present at the time of the CPD.  At a consultative examination in March 2005, the claimant was able to walk in the examining room without a cane.  He was able to stand on his tiptoes and on his heels.  The neck showed no spasm or limitation of motion.  The range of motion of the neck showed rotation at 75 degrees to the right and to the left and extension at 65 degrees and flexion at 60 degrees.  The exam of the thoracolumbar spine showed tenderness in the left lumbosacral area and minimal spasm was noted.  Forward flexion of the spine was at 60 degrees, lateral bend to the left at 25 degrees and to the right at 30 degrees.  Leg-raising was normal in the sitting position, bilaterally.  Ankle and jerks were normal, bilaterally.  Girth measurements were taken at 9 centimeters below the lower pole of the patella, and measured 45 centimeters on the right and the left.  X-rays of the lumbar spine showed no evidence of bony abnormalities or sondylolistehsis.  (See Exhibit 10F).  In the psychological examination report it was reported that there were no signs of disability or impairment; the claimant's posture and gait were within normal limits (see Exhibit 12F/2).  (Tr. 16).

Plaintiff argues that the ALJ's determination that he underwent medical improvement is not supported by substantial evidence.  According to Berry, the ALJ's reliance on the consultative examination by Dr. Albina is misplaced because Dr. Albina did not have the benefit of all the diagnostic tests that had been performed since his report, only mentioned the x-ray of the lumbar spine, and made no mention of the other MRI's or EMG study, all of which had been taken around the same period of time.  In addition, Berry contends that the record shows fluctuations and inconsistencies in his range of motion testing such that the results should not be determinative in showing medical improvement.  The Commissioner responds that substantial evidence supports the ALJ's determination.  According to the Commissioner, the March 2005 consultative examination shows that Berry's lumbar spine improved.  In addition, the Commissioner points to the absence of prescription pain medication as evidence of medical improvement.  The Commissioner further argues that Berry's cervical spine was not relevant given that he was found disabled under Listing 1.04( C)

because of a herniated lumbar disc with radiculopathy, not because of a limitation of the cervical spine.

The law is well established that medical improvement is related to a claimant's ability to work if there has been a decrease in the severity of the impairment and an increase in the claimant's functional capacity to do basic work activities. 20 C.F.R. § 404.1594(b)(3). This is shown by changes in the symptoms, signs and/or laboratory findings associated with the impairments. The Commissioner bears the burden of proof. Upon this record, substantial evidence does not support the ALJ's decision that Berry's condition improved. The ALJ has not cited to any specific symptoms, signs and/or laboratory findings to show not only that Berry's condition was improved after June 5, 2005, or how Berry's ability to work improved specifically after June 5, 2005 due to medical improvement. Here, Berry was awarded disability benefits based on a determination that his condition was medically equal to Listing 1.04, not subsection (c) as suggested by the Commissioner. The only diagnostic tests in the record are those that Berry had in 2001. The tests included the x-ray that was mentioned by Dr. Albina, but no mention was made of the MRI results of the lumbar or cervical spine or EMG test results. Here, the evidence is insufficient to support a finding of medical improvement related to the ability to work, and the Commissioner has not met his burden of proof on this issue.

The medical records indicate that Berry had a herniated cervical disk, herniated lumbar disk and lumbar radiculopathy and was not a surgical candidate. While Berry may not have been prescribed a strong narcotic for pain control, he, nonetheless, has continued to take muscle relaxers and Ibuprofen and there is no suggestion in the medical records of pain exaggeration. Because the ALJ's decision terminating benefits is not supported by substantial evidence, the instant action is

remanded to the Commissioner for further administrative proceedings.[3]  *Vicknair v. Astrue*, No. 1-08CV-052-C, 2009 WL 2949764 at *6 (N.D.Tex. Sept. 15, 2009 (remanding case where evidence failed to specifically demonstrate medical improvement).    To the extent that Berry has challenged the ALJ's determination that his alleged mental impairment, depression, was not a severe impairment, the undersigned finds that the ALJ failed to correctly apply *Stone v. Heckler*, 752 F.2d 1099 (5th Circ. 1985).

In *Stone v. Heckler*, 752F.2d 1099 (5th Cir. 1985), the Fifth Circuit opined that "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984).  The regulations provide "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The ALJ must "consider the combined effects of all impairments, without regard to whether any such impairment, if considered separately, would be of sufficient severity."  *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir. 1999); 20 C.F.R. § 404.1523.  The mere presence of a condition or ailment is not sufficient to establish that a claimant has a severe impairment.  *See Bowen,* 482 U.S. at 153.  Under *Stone*, a non-severe impairment is not expected to interfere with the individual's ability to work. Here, the ALJ wrote:

> While the record documents complaints of depression, no functional limitations have been established in conjunction with this condition.  The evidence shows that the

---

[3] Even though substantial evidence does not support the ALJ's decision, the Court does not suggest that Berry is or should be found disabled after June 1, 2005.

claimant underwent a psychological evaluation on April 28, 2005 (Exhibit 12F).  On exam, he was pleasant and cooperative.  He was a fair historian and his reliability appeared to be good.  His posture and gait were within normal limits.  His thoughts were organized, logical and coherent.  There was no disorganization, tangential, circumstantiality, or loosening of association.  His mood was described as irritable and his affect was euthymic.  He was oriented times four.  His concentration was fairly intact.  His insight and judgment were somewhat intact.  The claimant was not taking psychotropic medications.  The diagnosis was depressive disorder, not otherwise specified (NOS).  Having reviewed the record evidence, medical expert Dr. Ashok I. Khushalani, Board certified Psychiatrist, testified that the claimant has the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 CFR, Part 404, Subpart P, Appendix 1: mild restriction in maintaining concentration, persistence or pace; and no episodes of decompensation.  The claimant's mental impairment does not satisfy the paragraph "C" criteria of the applicable disorder listing (See also Exhibit 12F/2-3).  The undersigned gives great weight to Dr. Khushalani's credible testimony.

The evidence failed to establish that claimant's depression was severe within the meaning of 20 C.F.R. 404.1521 and 416.921.  In arriving at this conclusion, the term "severe," as defined in the Regulations, has been given the same construction as that pronounced by the Court of Appeals for the Fifth Circuit.  *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).  (Tr. 15).

The psychological evaluation on April. 28, 2005, along with the other evaluations, are consistent with a diagnosis of depression, that has been exacerbated at times by alcohol abuse.  Likewise, the testifying medical expert opined that Berry had depression and that Berry's depression had affected Berry's functioning to the extent he had several areas with "mild" restrictions.  While "mild" restrictions" would not meet or equal a listing, it is not a requisite for an impairment to be "severe" within the meaning of *Stone.*  The ALJ's interpretation allows a finding of non-severe even where, an impairment has a "slight" effect, on the claimant's ability to work.  *See also Rangel v. Astrue*, 605 F.Supp. 2d 840, 850-851 (W.D. Tex. Mar. 6, 2009).  Because this Court is bound to follow *Stone*, and given clear instructions by the Fifth Circuit to remand a matter in which *Stone* was not followed, this matter must be remanded.  *See Loza v. Apfel*, 219 F.3d 378, 393, 398-99 (5th Cir. 2000).

Accordingly, the matter should be remanded to the Commissioner for proceedings consistent with this Memorandum.  Because the matter must be remanded to the Commissioner for further proceedings, which could necessitate a new residual functional capacity, the Court need not address the merits of Berry's contention that the ALJ's residual functional capacity is not supported by substantial evidence and Berry's challenge to the hypothetical to the vocational expert.


## V.  Conclusion

Based on the foregoing, and the conclusion that substantial evidence does not support the ALJ's finding of medical improvement and the conclusion that the ALJ failed to properly apply the *Stone* standard concerning Berry's alleged mental impairment, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge

ORDERS that Defendant's Motion for Summary Judgment (No. 16), is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 11) is GRANTED, and that this case is remanded to the Social Security Administration pursuant to 42 U.S.C. §405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 4th  day of March, 2010.

_Frances H. Stacy_
Frances H. Stacy
United States Magistrate Judge